## NATIONAL LABOR RELATIONS BOARD v. AMERICAN CAR & FOUNDRY CO.
### No. 9202.

Circuit Court of Appeals, Seventh Circuit.
April 30, 1947.

MAJOR, Circuit Judge, dissenting.

A. Norman Somers, Asst. Gen. Counsel, Ralph Winkler, Atty., Gerhard P. Van Arkel, Gen. Counsel, Morris P. Glushien, Associate Gen. Counsel, and Fannie M. Boyls and Thomas B. Sweeney, Attys., N.L.R.B., all of Washington, D. C., for petitioner.

J. Donald Rawlings and Hardy, Stancliffe & Hardy, all of New York City, for respondent.

Before EVANS, MAJOR, and MINTON, Circuit Judges.

MINTON, Circuit Judge.

The petitioner, hereinafter referred to as the Board, found the respondent, hereinafter referred to as the company, guilty of a violation of Section 8(3) of the National Labor Relations Act, 29 U.S.C.A. § 158 (3), because it had discriminatorily discharged one Roper, and ordered that the company cease and desist from such an unfair labor practice, reinstate Roper with back pay, and post appropriate notices. The Board asks the enforcement of its order.

The questions presented are whether there is substantial evidence in the record to support the Board's findings; and,

secondly, whether, if the Board's findings are sufficient, the company thereby discriminated against Roper in violation of Section 8(3) of the Act.

The Board found that the company had discriminatorily discharged Roper because he would not join the union of the Brotherhood of Railway Carmen of America, an affiliate of the American Federation of Labor, which was the lawfully designated bargaining unit for certain of its employees. The company had no closed shop or union shop agreement with the union. In short, the Board held that in the absence of such an agreement covering an employee such as Roper, he could not be compelled to join the union.

■ The company contended that it had discharged Roper because he had not obeyed the rule of the company which forbade leaving his place of work before the whistle blew. There can be no question of the right of the company to discharge one of its employees for the violation of such a rule. National Labor Relations Board v. Sheboygan Chair Co., 7 Cir. 125 F.2d 436.

The Board had to determine whether Roper was discharged because he would not join the union, or because he had violated the company's rule. The Board attributed the company's action to the former and not the latter.

■ We consider first whether there was substantial evidence to support the Board's findings. In this posture of the case, we shall consider only the evidence that sustains the Board's findings. The following facts, it seems to us, constitute substantial evidence in support of the Board's findings.

Roper worked as a chainer with a lead chainer in the moving of material into position for pieceworkers to use in the construction and assembly of railroad cars which the company was building for the United States. He was paid by the hour on the basis of an eight-hour day. He did not belong to the union, although often solicited to join and told by a union member that if he did not join, the union men would not work with him.

On the morning of June 27, 1944, the other chainers in Roper's department re-fused to work with him. The assistant foreman, Brawley, had to transfer him to another department, after which the men resumed work. The work stoppage lasted about an hour. Brawley told Roper the men did not seem to want to work with him because he would not join the union. Roper stated that he understood he did not have to join the union. Brawley replied that he did not, but the union men did not want to work with him.

The company had posted notices on its bulletin boards instructing its employees that they should not leave their place of work before the quitting whistle blew. It had also instructed its foremen to inform the hourly workers that any man who left his place of work before the whistle blew would be discharged therefor. A short time prior to the work stoppage, several union members demanded of Brawley that he fire Roper, and threatened to quit if he did not. The foreman said that he "would have to get something on him" before he could fire him.

On July 11 the foreman checked up on Roper and found him in the washroom cleaning up and changing his clothes about a half-hour before the quitting whistle blew. Roper's lead chainer and other workers were in the washroom cleaning up at the same time. The foreman just looked in and saw Roper and never looked further. On the following morning only Roper was told to report to the office for his time and was told he was discharged for violating the rule of the company which forbade leaving his place of work before the quitting whistle blew. The union men had known that the foreman was going to the washroom to check up on Roper, and after Roper was fired the foreman told the union men, "I told you I would get rid of him, didn't I?"

■ On this evidence, the Board found that the real reason for Roper's discharge was because of his refusal to join the union, and to appease the union members. We think this conclusion is supported by the substantial evidence above set forth.

The company also contends that even if it did discharge Roper because he would not join the union, with which it had no closed or union shop agreement, such action was not a violation of Section 8(3) of the Act.

The argument of the company is as follows:

"At first blush the use of the word 'encourage' would seem to apply to the situation existing in this case. However, when Section 1 is read and the interpretations of Section 8(3) are considered, it is clear that the word 'encourage' is used in connection with the general purposes to be accomplished by the Act, namely, to prevent anti-union activities.

"Thus, the word 'encourage' clearly contemplates a situation where an employer encourages an employee to join a company controlled union or to join one of two rival unions. However, where the employee is not a member of another union or where the union is clearly not a company controlled union, then an employer who encourages an employee to join the union representing other employees could not possibly violate the Act, since no anti-union policy would be involved."

With this we are unable to agree. Section 8(3) of the Act provides that it shall be an unfair labor practice for an employer to discriminate in the hire or tenure of employment of any of its employees in order to encourage or discourage membership in a labor organization, with a proviso that the employer shall be excused from such discrimination if it is done in accordance with an agreement with a lawful union with which the employer has a bargaining agreement requiring membership in the union.

■ The purpose of the Act is to encourage the free organization of employees unmolested by the interference, restraint, or coercion of the employer. National Labor Relations Board v. W. A. Jones Foundry & Machine Co., 7 Cir., 123 F.2d 552, 555. The employer is enjoined to keep hands off in a matter of primary concern to its employees, as far as Congress was empowered to so command. See National Labor Relations Board v. Virginia Electric & Power Co., 314 U.S. 469, 477, 62 S.Ct. 344, 86 L.Ed. 348. If the employer discriminates in the hire or tenure of its employees in order to *discourage* organization, there is no escape from liability for an unfair labor practice under Section 8(3) of the Act. Without the proviso, the Act would have made *encouragement* likewise an unfair labor practice. This would have ham-pered the organizational activities of unions as they could not have bargained for and obtained an agreement for a closed or union shop. Hence the proviso.

■ Therefore, it seems to us that in the absence of the agreement contemplated by the proviso, the encouragement of organization is an unfair labor practice. To coerce or force an employee to join a union, in the absence of a closed or union shop agreement with a lawful union, is to encourage membership therein. It is encouragement not protected by the proviso, and is an unfair labor practice within the meaning of Section 8(3). As we have pointed out, the company had no agreement with the union for a closed or union shop. It therefore encouraged organization without the protection of the agreement contemplated in the proviso, and was in violation of Section 8(3).

It was suggested at the argument that the cease and desist order as drawn would prevent the company from entering into a closed or union shop agreement with its employees if it so desired. We do not have to pass on this question in this record as it does not appear that the company wants such an agreement. There will be ample time to decide that question when the company seeks such an agreement, if it ever does, and applies for a modification of the order if it believes the order restrictive of its desired action.

The Board's order will be enforced.

MAJOR, Circuit Judge (dissenting).

In my judgment, the finding on which the Board's order is predicated is without substantial support. The discharge of Roper was motivated solely by respondent's desire to keep a war plant in operation. It had nothing to do with creating the situation with which it was confronted. The controversy giving rise thereto was entirely between Roper and members of the union. The latter refused to work with Roper unless he joined their union. This Roper refused to do. The union employees threatened to strike rather than work with him, and they did strike.

Thus respondent was confronted with an urgent problem. What was it to do in order to avoid a further and perhaps continued cessation of work by its union employees? In my opinion, it did what any fair and

prudent employer would have done. It furnished Roper employment in another department. If respondent had desired to discharge Roper because of his refusal to join the union, it appears reasonable to think it would have done so at that time. That it had neither the desire nor the motive however, is conclusively evidenced from the undisputed fact that it had a long standing policy of non-discrimination as to the hire and tenure of its employees. Roper was aware of respondent's policy in this respect; in fact, he was specifically informed on more than one occasion that membership in the union was not required.

Placing Roper in a different department, however, did not alleviate the difficulty or solve the problem with which respondent was confronted. The union persisted in its demand that Roper be discharged. Thus, driven to an extremity and as a last resort, respondent finally told the union that it "would have to get something on him" before he could be discharged. This statement clearly indicates that respondent would not discharge Roper because of his non-union membership but that it would only do so if and when it found a valid reason. True, it looked for such reason, and equally true, it found it. This is conceded. But instead of utilizing this legitimate ground for discharge which respondent admittedly had, it did the unbelievable and nonsensical thing, according to the Board's finding, of discharging him for his refusal to join the union. To me, such theorizing as a basis for a finding of fact borders upon the absurd and it cannot afford any substantial basis for the finding made.

I would deny enforcement of the Board's order.